SMITH, Respondent, v. ATCO COMPANY and another, Appellants.*

*January 9—February 3, 1959.*

* Motion for rehearing denied, without costs, on April 7, 1959.

374

For the appellants there were briefs by *Arnold, Philipp &
Murray* of Milwaukee, for the Atco Company, and by *Samuel Weitzen* of Milwaukee, for the Delta Oil Products Company, and oral argument by *Mr. Suel O. Arnold* and *Mr.
Weitzen.*

For the respondent there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Kurt H. Frauen* and
*John J. Ottusch* of counsel, all of Milwaukee, and oral argument by *Mr. Frauen* and *Mr. Ottusch.*

A brief was filed by *Emmet Horan* of Milwaukee, as
*amicus curiae.*

CURRIE, J.   The following issues are raised on this appeal:

(1) Is the first question of the verdict, which inquires as
to the misbranding of Penta-Mix, properly included in the
verdict, and does it sustain the judgment in the absence of
any finding that such misbranding was causal?

(2) In order to hold the manufacturer or supplier of an
article liable to the ultimate consumer on the theory of negligence, where there is no privity between the plaintiff and
defendant, is it necessary that the article be of a category
classified as "inherently dangerous" in the law?

(3) Are the jury's findings that Penta-Mix is inherently dangerous to mink, and that Penta-Mix caused the plaintiff's losses, sustained by the evidence?

(4) Was prejudicial error committed during the course of the trial which would necessitate a new trial?

(5) Is Delta liable to the plaintiff as well as Atco?

(6) Are the damages excessive?

(7) Is the plaintiff entitled to interest on the verdict from December 1, 1952?

(1) *Misbranding.* The 30-gallon drum of Penta-Mix sold by Atco to Cavan bore a label which contained the following statement, "When dry, wood treated with Penta-Mix can be handled freely without danger of contamination to humans or animals." It was the position of the learned trial court in submitting the first question of the special verdict to the jury that it constituted negligence on the part of the defendants to have placed such statement on the drum label if Penta-Mix-dipped nesting boxes, even after they had dried, were harmful to mink housed therein. We agree with such conclusion.

Counsel for plaintiff contend that the wording on the label violated sec. 94.67, Stats. 1949, which forbade the manufacture or sale of any insecticide or fungicide which was misbranded within the meaning of sec. 94.70, Stats. 1949. However, ch. 516, Laws of 1951, repealed such two sections and re-created substantially the essential provision of the same as sec. 94.70, Stats. 1951. Such ch. 516, Laws of 1951, provided that newly created sec. 94.70, should not take effect until six months after publication of the act. This was due to the inclusion of a newly enacted registration provision in order to afford manufacturers a reasonable period of time in which to register their products. Both the sale of the Penta-Mix by Atco to Cavan, and from Cavan to Smith, occurred during such six-month period. We find no merit to

the position advanced by defendants' counsel that secs. 94.67 and 94.70, Stats. 1949, were repealed effective with the passage and publication of ch. 516, Laws of 1951, so as to leave a six-month hiatus period during which no labeling statute was applicable to a fungicide such as Penta-Mix. Such interpretation would lead to an absurd result that we do not deem the legislature could have contemplated.

One of the more-troublesome questions in connection with the misbranding issue is whether, in addition to submitting question No. 1 in the verdict, the trial court should not have also submitted a question inquiring as to whether the found misbranding was a cause of Smith's losses and damage. The trial court, in instructing the jury with respect to question No. 1 of the verdict, limited the issue of misbranding solely to the statutory violation.[1] Therefore, the issue of causation must be approached from the standpoint of whether the violation of sec. 94.67, Stats. 1949, was causal. Such violation consisted of the fact that the label stated that wood treated with Penta-Mix, when dry, could be handled freely without danger of contamination to animals.

Even though a violation of sec. 94.67, Stats. 1949, constitutes negligence *per se* it does not follow that such negligence was a cause of Smith's losses and damage. For example, sec. 346.63, Stats. 1957, and predecessor statutes, made it unlawful for one to operate an automobile on the highway while under the influence of intoxicating liquor, and an operator who violates such statute is guilty of negligence *per se*. However, this does not automatically make him liable to others merely because the vehicle he is operating is involved

---

[1] Irrespective of statute, a manufacturer may render himself liable for misbranding, or failing to warn of harmful propensities by label, at common law. *Henry v. Crook* (1922), 202 App. Div. 19, 195 N. Y. Supp. 642; *Wright v. Carter Products* (2d Cir. 1957), 244 Fed. (2d) 53; Dillard and Hart, Product Liability: Directions for Use and Duty to Warn, 41 Virginia Law Review, 145; and paragraph (c) of Restatement, 2 Torts, p. 1039, sec. 388.

in an accident. In order to predicate liability there must have been some causal connection between the statutory violation and the accident. *Frey v. Dick* (1956), 273 Wis. 1, 76 N. W. (2d) 716, 77 N. W. (2d) 609; *McNamer v. American Ins. Co.* (1954), 267 Wis. 494, 66 N. W. (2d) 342; and *Steinkrause v. Eckstein* (1920), 170 Wis. 487, 175 N. W. 988. At page 490 of the opinion in the *Steinkrause Case* there are listed a number of cases of the occurrence of a statutory violation where liability was not found because of the lack of any causal connection between the violation and the accident.

As stated by Mr. Justice ESCHWEILER in the *Steinkrause Case,* sometimes such causal connection may be so clear upon undisputed facts as to make the determination of causation one of law for the court, while in other situations it becomes one of fact for the jury. The statutory violation in the instant case clearly falls in the latter category.

Counsel for the defendants, in their motions after verdict, raised no issue as to the failure of the trial court to include a question in the verdict with respect to the misbranding being causal. Under the provisions of sec. 270.28, Stats., we must assume that the trial court determined such causation issue in favor of the plaintiff in conformity with the judgment entered. This brings us to the question of whether there is any credible evidence to sustain such a finding. We find none.

There is no direct evidence that Smith ever saw the label on the drum of Penta-Mix from which the 15 gallons purchased by Smith were drawn by employees of Cavan and delivered in five-gallon cans to Smith's premises. However, Smith testified that before he used any of the Penta-Mix he was party to a conversation on the Cavan premises in which one Thiel, a sales representative of Atco, and Cavan participated. He further testified that in such conversation Thiel stated that, if the nesting boxes were treated with Penta-Mix

according to the formula suggested by Atco, there would be no injury to mink after ten days to two weeks. Smith was then asked this question and gave the following answer thereto:

"*Q.* Where was that [the formula for mixing Penta-Mix with kerosene or fuel oil]? *A.* On the label on the drum."

From this it could be inferred that Smith did see the label on the drum. However, such evidence does not establish that he read the alleged misleading statement on the drum, which constituted the misbranding. Furthermore, there is no evidence that he relied on such statement on the label in using the Penta-Mix to treat his nesting boxes. It is, therefore, our conclusion that there was no credible evidence to sustain a finding that the misbranding was causal. For this reason the judgment cannot be sustained upon the finding of misbranding made by the jury in answering question No. 1 of the verdict. If the judgment on the issues of liability is to be sustained, it must be upon the basis of the jury's answers to other questions in the verdict.

No question was submitted to the jury as to whether Thiel's verbal statement constituted an actionable misrepresentation and that issue is not before us on this appeal. Such verbal statement would have some slight materiality in the jury's consideration of question No. 4 of the verdict. This is because it discloses that Atco knew that Penta-Mix was being used for treatment of mink nesting boxes.

(2) *"Inherently dangerous."* Counsel for the defendants contend that the jury's answer to question No. 2 of the verdict, whereby the jury found that the Penta-Mix sold to Cavan was inherently dangerous to mink, cannot be permitted to stand because Penta-Mix is not an "inherently dangerous" product as a matter of law.

Courts, when first faced with the problem of whether a manufacturer was liable in negligence to remote vendees, or

other third persons, formulated a "general rule" that there was no such liability in the absence of privity of contract. From time to time exceptions have been engrafted onto such general rule. For an excellent review of the origin of such general rule and of the recognized exceptions thereto formulated by the American courts over the years, see comment note by A. W. Gans entitled, "Manufacturer's liability for negligence causing injury to person or damage to property, of ultimate consumer or user," 164 A. L. R. 569.

One of such recognized exceptions to the general rule of nonliability is when the manufacturer puts out or sells articles which are "inherently dangerous." *Hasbrouck v. Armour & Co.* (1909), 139 Wis. 357, 364, 121 N. W. 157, and *Coakley v. Prentiss-Wabers Stove Co.* (1923), 182 Wis. 94, 101, 195 N. W. 388. Counsel for defendants place particular reliance upon *Beznor v. Howell* (1930), 203 Wis. 1, 233 N. W. 758, which held as a matter of law that a sparkler in the hands of a small child was not an inherently dangerous instrumentality.

The Massachusetts court in the case of *Carter v. Yardley & Co.* (1946), 319 Mass. 92, 64 N. E. (2d) 693, 164 A. L. R. 559, carefully reviewed the development of the law of products liability of manufacturers and suppliers for negligence where no privity of contract exists. That court came to the conclusion that the exceptions had so swallowed up the general rule of nonliability that such general rule for all practical purposes had ceased to exist. The conclusion reached was expressed as follows (319 Mass. 104, 64 N. E. (2d) 700) :

"The time has come for us to recognize that that asserted general rule no longer exists. In principle it was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We now abandon it in this commonwealth."

Authorities in the field of torts, who in recent years have written on the subject of products liability, are in accord with the conclusion reached by the Massachusetts court in *Carter v. Yardley & Co., supra.* For example, 2 Harper and James, Law of Torts, p. 1535, sec. 28.1, states:

"This older restrictive doctrine [nonliability in case of no privity] was well adapted to protect the manufacturer from burdens on his activity, but it did so at the expense of the victims of his mistakes. The citadel of privity has crumbled, and today the ordinary tests of duty, negligence, and liability are applied widely to the man who supplies a chattel for the use of another. This trend was responsive to ever-growing pressure for protection of the consumer, coupled with a realization that liability would not unduly inhibit the enterprise of manufacturers and that they were well placed both to profit from its lessons and to distribute its burdens."

We deem that the time has come for this court to flatly declare that in a tort action for negligence against a manufacturer, or supplier, whether or not privity exists is wholly immaterial.[2] The question of liability should be approached from the standpoint of the standard of care to be exercised by the reasonably prudent person in the shoes of the defendant manufacturer or supplier. Such an approach will eliminate any necessity of determining whether a particular product is "inherently dangerous." If a manufacturer or supplier is hereafter to be relieved from liability as a matter

[2] A divided Michigan court in the recent case of *Spence v. Three Rivers Builders & Masonry Supply* (1958), 353 Mich. 120, 90 N. W. (2d) 873, abolished privity as a test of liability in breach-of-implied-warranty cases against a manufacturer as well as in tort actions grounded upon negligence. Wisconsin, however, requires that privity exist between the plaintiff user and the manufacturer, or supplier, in breach-of-implied-warranty cases. *Cohan v. Associated Fur Farms* (1952), 261 Wis. 584, 589, 53 N. W. (2d) 788, and *Kennedy-Ingalls Corp. v. Meissner* (1958), 5 Wis. (2d) 100, 109, 92 N. W. (2d) 247.

of law by the courts, such result should be reached on the basis that there was no causal negligence established against the defendant rather than that the product was not inherently dangerous.

(3) *Is there credible evidence to sustain jury's findings that Penta-Mix was dangerous to mink and caused plaintiff's losses?* Defendants' counsel contend that the answers of the jury to questions Nos. 2 and 3 of the verdict are not supported by credible evidence. In passing upon this contention the evidence must be viewed from a standpoint most favorable to the plaintiff. *Henthorn v. M. G. C. Corp.* (1957), 1 Wis. (2d) 180, 184, 83 N. W. (2d) 759. Furthermore, it is only necessary to consider the testimony which sustains the verdict. *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 62 N. W. (2d) 549, 63 N. W. (2d) 740. We, therefore, will set forth the testimony that we believe does support the jury's answers to these two questions.

The mink on the Cavan and Smith ranches in 1952 were fed and treated exactly alike. The two ranches were directly adjacent to each other and Cavan and his employees cared for all of the mink on both ranches. The only difference in the treatment of the mink on the two ranches was that on the Smith ranch the nesting boxes had been treated with a Penta-Mix solution. In 1952 Cavan had a production of 1,100 kits on his ranch and his death loss was but 75, and of these 75 lost about 25 were due to a temporary heat condition that was peculiar to an unshaded portion of his premises which did not prevail on the Smith ranch. On the other hand, Smith had a production on his ranch that year of from 1,600 to 1,800 kits. Only 663 of these survived to pelting time in December, 1952; all of the others having died in the meantime. The testimony developed no discoverable reason why Smith's death-loss ratio of kits born was so many times

larger than that of Cavan's, except for the dipping of the Smith nesting boxes in the Penta-Mix solution.

One Barr testified as a witness for the plaintiff. Barr is a mink rancher of some twenty years' experience who operates a very large mink ranch. He had his ranch divided into three yards during the 1957 season. In yards Nos. 2 and 3 he used nesting boxes dipped in Penta-Mix solution while in yard No. 1 practically all of the nesting boxes were undipped. The kit production for the 1957 season in yard No. 1 was three and nine-tenths kits per litter which is approximately normal. Many deaths occurred among the kits in yard No. 2 in which 1,127 nesting boxes were in use and the end production for the season was 900 or less than one mink per litter. In yard No. 3 there were 500 dipped boxes in use and some deaths occurred but nothing like the number in yard No. 2. The end production in yard No. 3 averaged three kits per litter which is somewhat below normal. However, the nesting boxes in yard No. 3 were made of new wood while in yard No. 2 the nesting boxes were used ammunition boxes, the same as were Smith's nesting boxes.

Meyer, another experienced mink rancher, who is one of the two partners operating the Ivanhoe Mink Ranch near Mundelein, Illinois, also testified for the plaintiff. In 1952 this ranch used nesting boxes of which approximately one half had been dipped in Penta-Mix solution and the dipped boxes were placed together in one part of the yard. The ranch had 500 adult female breeders at the start of such season, so that about 250 were housed in dipped nesting boxes. The loss of kits in the dipped boxes was approximately 750 while the death of kits in the undipped boxes was only normal. The fur of the surviving mink in the dipped boxes was inferior. The care and feed supplied to the mink housed in the dipped boxes were identical to that of those in the undipped boxes.

In 1956 Meyer ran an experiment in which ten nesting boxes were employed. Five were dipped in Penta-Mix solution and five were not. The dipped boxes were allowed to dry seven weeks before the female mink were placed in them. Only a normal death loss occurred in the undipped boxes while the death loss was very heavy in four of the five dipped boxes.

The plaintiff also called as an expert witness a Dr. Hartsough, a qualified and practicing veterinarian who for many years had specialized in the diseases of mink. Dr. Hartsough was asked by way of a hypothetical question whether Smith's kit losses were the result of dipping the nesting boxes in the Penta-Mix solution. It was this witness' opinion, to a reasonable degree of certainty in the field of veterinary medicine, that the respondent's losses were caused by the Penta-Mix solution. He had the same opinion with regard to the stunting of growth of the surviving kits. Dr. Hartsough performed an autopsy on some dead kits housed in Penta-Mix-dipped nesting boxes on another ranch and could find no cause for their deaths. These post-mortem examinations eliminate several other possible causes of death including any bacterial causes. We find no error in the assumed facts stated in the hypothetical question propounded to this expert witness, and hold that the reception of his opinion evidence was proper.

Both Cavan and Barr, each of whom had had approximately twenty years' extensive experience in the mink ranch business, were permitted to testify as expert witnesses and give opinion testimony. Cavan gave it as his opinion that the death of Smith's kits was because of the dipping of the nesting boxes in the Penta-Mix solution. Barr testified that in his opinion the death of the kits in yard No. 2 on his own ranch in 1957 was due to a like cause. Counsel for the defendants strenuously urge that it was error to permit these

two laymen to qualify as experts and give such opinion testimony. However, we find no abuse of discretion, or error, in receiving such expert testimony. Anno. 49 A. L. R. (2d) 932, 971, entitled, "Admissibility of opinion evidence of lay witnesses as to diseases and physical condition of animals." Cf., *Vates v. Cornelius* (1884), 59 Wis. 615, 18 N. W. 474.

The foregoing review of evidence favorable to the plaintiff, even though much of it is circumstantial in nature, demonstrates to our satisfaction that there was ample credible evidence to sustain the jury's answers to questions Nos. 2 and 3 of the verdict. There was considerable testimony adduced by the defendants tending to prove that nesting boxes dipped in Penta-Mix solution had not proved harmful to mink, but the weight to be accorded such evidence was for the jury.

No assignment of error was made by the defendants with respect to the jury's answer to question No. 4 of the verdict. Such question inquired as to whether the defendants ought to have known, in the exercise of ordinary care, that Penta-Mix was inherently dangerous to mink. Because of our holding herein that it is no longer necessary to qualify a product as inherently dangerous in order for the ultimate user to recover in negligence against a manufacturer or supplier, questions Nos. 2, 3, and 4 could well have been combined into two questions. The first of these would be the negligence question and the second the causation question. Foreseeability of harm to others through the use of the product is an element of negligence and not of causation. *Pfeifer v. Standard Gateway Theater* (1952), 262 Wis. 229, 234, 55 N. W. (2d) 29, and *Osborne v. Montgomery* (1931), 203 Wis. 223, 242, 234 N. W. 372.

(4) *Alleged errors in course of trial.* On direct examination Smith testified that one of the reasons he sold off his 500 breeders at the end of the 1953 season was because

he ran out of money and had to reduce his herd. Counsel for the defendants sought to go into such issue on cross-examination and show by the use of income-tax returns that this was not so. The trial court sustained an objection to such line of cross-examination. The tax returns proposed to be used by defendants' counsel were joint returns of Smith and his wife. If copies of such returns had been received in evidence there would still be the question of which assets shown were owned by Mrs. Smith and which by Smith. We deem the ruling made to have been within the discretion of the trial court in preventing the exploration of side issues of little materiality. *Feldstein v. Harrington* (1958), 4 Wis. (2d) 380, 391, 90 N. W. (2d) 566.

During the examination of one of defendants' witnesses such witness persisted in disregard of the warnings of the trial court in giving irrelevant answers. The trial court finally admonished the witness to the effect that if he instigated or precipitated a mistrial he would go to jail "for a good long time." While we do not approve of such threat of a long jail imprisonment, the conduct of the witness did warrant a stern warning. We do not find the error committed to be of such a prejudicial character as to require a new trial on the liability issues.

One of the ingredients of Penta-Mix is pentachlorophenol. During the argument of plaintiff's counsel to the jury he stated that there was carbolic acid in Penta-Mix. Counsel for the defendants promptly objected and moved for a mistrial. The trial court sustained the objection, denied the motion for mistrial, and stated to the jury that the record did not disclose the chemical composition of Penta-Mix. Counsel for the plaintiff then stated, "It [referring to a statute] indicates what phenol is." Again an objection and motion for mistrial were interposed and again the trial court sustained the objection and denied the motion for new trial.

The trial court at the same time instructed the jury as follows: "The jury will disregard any reference to the alleged composition of this material because no chemist or any other individual ever testified to what it did consist of."

We deem that such instruction was sufficient to prevent prejudice resulting from the improper statement made by plaintiff's counsel in his argument. Sometimes a statement made in argument is so improper and prejudicial that it cannot be cured by a mere instruction of the trial court to disregard the same. We do not consider such to be the case here. There is no testimony that any of the mink ever ate any Penta-Mix or got it into their bodies. Its harmful effect on mink is apparently due to external contact. It is common knowledge that preparations containing carbolic acid are prescribed for external treatment of humans with no harmful effects.

(5) *Liability of Delta.* The officers of Delta and Atco are the same. The president of these two defendants personally developed the formula for manufacturing Penta-Mix for Atco. Atco then turned the formula over to Delta to manufacture and Atco supplied the labels to be affixed to the containers in which it was marketed. Atco acted as exclusive selling agent and furnished Delta with shipping directions. Title passed from Delta to Atco and then from Atco to the purchaser. The contention is advanced in behalf of Delta that it cannot be held liable in the instant action.

We do not consider that these facts insulated Delta from liability. If Atco should have known that Penta-Mix is harmful to mink, so should have Delta. Having common officers, knowledge of the one corporation was knowledge to the other. A manufacturer's liability to an ultimate user in a tort action grounded upon negligence does not depend upon how many times title passed from one intervening

vendee to another. As we have previously held herein, privity of contract is not an element to be considered.

(6) *Excessive damages*. After a careful review of all the evidence bearing on damages it is our considered judgment that the jury's finding of $27,720 is grossly excessive and cannot be permitted to stand.

While Smith re-used the dipped nesting boxes in 1953 and had losses of kits through death, stunting of growth, and injury to fur quality in that year, no recovery can be had for the same. This is because the letters of the Smith's attorneys to Atco of September 20, 1952, and November 28, 1952, conclusively establish that Smith then believed his 1952 losses were due to the Penta-Mix-dipped nesting boxes. Possessing this knowledge, he could not use such dipped boxes a second season and hold the defendants liable for losses sustained as a result of such continued use of such dipped boxes. This is especially true when the cost of such boxes was but 35 cents apiece.

Smith also claimed as damages the difference between the purchase price of $40 per mink and the lesser pelting price received from the sale of 463 breeders at the end of 1953. The evidence discloses four possible ways by which mink kits might have been killed or stunted by reason of being housed in nesting boxes dipped in Penta-Mix solution. One was the toxic effect on the skins coming in contact with the material. A second possibility was harmful fumes. Another was that the Penta-Mix caused an irritation to the mother minks' breasts resulting in a scab forming over the nipples so that the kits were unable to nurse. The fourth possibility was that the mother minks became poisoned by the Penta-Mix with the result that their milk was contaminated, and the kits absorbed such poison through the mothers' milk.

In order for Smith to recover for the death and injury of the kits, it was not necessary that he establish which of these

four possible methods of injury caused the same. However, this is not the case with respect to the damages claimed as a result of the sale of the 463 breeders originally purchased from Cavan. There was no outward manifestation of damage to such breeders, but Smith contends that they had been so contaminated as to endanger their use as future breeders. On the basis of the record before us this is sheer speculation. Dr. Hartsough testified that it was his opinion that the kits died from exposure to the Penta-Mix material. He was then asked this question and gave this answer:

"*Q.* Now let's take exposure; what did you mean by exposure; tell us what you mean by exposure. *A.* Well, it is exposure to the material in question. Whether it comes through the skin, whether it comes through the mother's milk or whether the kits got it from the nipples of the mother, we don't know. We just know that it did hurt 'em."

By elimination of any claimed losses occurring subsequent to 1952, the remaining legitimate items of damage consist of the following:

1. Value of kits which died during the 1952 season due to the use of the dipped nesting boxes.

2. The decreased value of the pelts from the surviving 1952 kits due to stunting and inferior fur.

3. The value of the 1,200 nesting boxes dipped in Penta-Mix solution less salvage value, if any.

4. The value of any adult breeders which died during the 1952 season whose deaths were caused by the dipped nesting boxes.

Items 2, 3, and 4 would account for only a small fraction of the $27,720 awarded by the jury. Item 2, as claimed by Smith, amounts to $2,840. Item 3, assuming no salvage value, amounts to but $420. Item 4, as claimed by Smith, amounts to $1,480. We have some doubt if item 4 was properly proved by Smith, because the record is silent as to what

the normal death ratio of breeder mink is during a year. The testimony discloses that 37 breeders died but the defendants would only be liable for that part of such number which exceeded the normal death ratio.

This leaves for consideration item 1, the value of the kits which died in 1952 as a result of being housed in the dipped nesting boxes. The testimony discloses that the average normal production of kits is four per litter. On this basis, Smith's 400 female breeders should have produced 1,600 kits in 1952. In the letter of Smith's lawyers to Atco of September 20, 1952, this is the production figure claimed. However, at the trial Smith upped this figure to 1,800 claiming a birth of four and one-half kits per litter, although very few actual litters were counted. The surviving kits numbered 663, of which 626 were pelted and 37 were retained as breeders to replace the 37 breeders which had died. On the basis of 1,600 births, the death loss was 937. On the other hand, if the 1,800 claimed birth figure is taken, the death loss would have been 1,137.

However, in computing damages, from either the 937 or 1,137 figure, there must be deducted such number as represents the normal death ratio. Cavan testified that he sustained 75 kit deaths in 1952 on his own ranch out of 1,100 births of which he estimated approximately 50 were due to normal causes. As Cavan's mink received identical care with that provided Smith's, except that Cavan did not dip his nesting boxes, this death ratio of 50 to 1,100, or approximately four and one-half per cent, is probably as accurate a measure of the normal death ratio as can be obtained. Another rancher testified to a normal death ratio of from two to four per cent. For the purpose of demonstrating the excessiveness of the $27,720 damages we will assume that 1,050 kits died in 1952 due to the dipped boxes, although we consider the proper figure to have been considerably less.

In the letter of plaintiff's attorneys to Atco of September 20, 1952, the claimed death loss was approximately 800.

Smith's brief contends that the market value of the kits which died was $30 each as of July 1, 1952. On the other hand, the defendants contend such market value was the pelting price received for the survivors less the expense of raising the kits to time of pelting. Under Smith's contract with Cavan this expense amounted to $11.60 per kit.

The only testimony bearing on the $30 figure was given by Cavan. He testified that sometimes kits are sold as breeders at weaning time about July 1st when six weeks old. He further stated that such six-weeks-old kits would have a value of $30 each for breeders based upon the $40 price paid by Smith, and deducting therefrom $10 per head for cost of raising them till they reached the adult stage. However, Smith did not sell a single one of the surviving mink as breeders at the six months' age, or later. Cavan did not testify that he did either. If there was a ready market at $30 apiece for six-months-old kits, it is highly unlikely that either Smith or Cavan would have retained them for pelting purposes in order to receive a lesser price than $30 per head, and also thereby incur the additional expense of $11.60 apiece to raise them to pelting age. Furthermore, the breeders sold by Cavan to Smith were selected as the best of Smith's 1951 production of kits and the remainder were pelted. It is highly speculative to assume that all the kits which died had the qualities necessary to warrant the $40 per head price as breeders. We conclude that there was no competent evidence establishing a market value of $30 per kit as of July 1, 1952.

The market value of the dead kits should have been based upon the value at pelting age for pelters of normal quality of the four types of mink grown by Smith, less therefrom

the cost of $11.60 each for raising them. Smith was growing his mink for pelters and not for sale as breeders. This method of computing the value of mink grown for pelters was approved by this court in *Bell v. Gray-Robinson Construction Co.* (1954), 265 Wis. 652, 62 N. W. (2d) 390.

Based upon the sales price Smith received for the 626 mink pelted in December, 1952, the average value was approximately $17.50. However, if the quality had been normal such sales price would have been approximately $4.50 apiece more ($2,840 divided by 626). Therefore, the average market value per kit as of July 1, 1952, would have been approximately $22, less $11.60, or $10.40. On the basis of a loss of 1,050 kits, the total damages for the 1951 death loss would be $10,920.

Therefore, Smith's recoverable damages did not exceed the following:

| | |
|---|---:|
| Death loss of kits | $10,920 |
| Decreased value of pelts sold | 2,840 |
| 1,200 dipped nesting boxes | 420 |
| Loss of 37 breeders | 1,480 |
| Total | $15,660 |

The least amount at which a fair-minded jury, properly instructed, would probably assess Smith's damages is considerably less than this. Such a jury could well conclude that Smith had not proved that the 37 breeders died because of the Penta-Mix solution, and that the total 1952 kit loss due to such cause was 800. By elimination of any damage for the 37 breeders, and by reducing the kit death loss to 800, the damages would be reduced from $15,660 to $11,580. It is our conclusion that Smith should be granted the option of electing to remit $16,140 of the amount of the judgment, and, if he fails so to elect, then the judgment should be re-

versed and a new trial had confined to the issue of damages only.[3]

(7) *Interest on the verdict.* Smith, by his motion for review, alleges it was error for the trial court to deny interest on the verdict computed from December 1, 1952. He selects such date of December 1, 1952, because of the written demand for payment of damages made upon Atco on November 28, 1952, by his attorneys.

We deem that the correct rule as to the recovery of interest, where the claim is unliquidated, was stated in *Maslow Cooperage Corp. v. Weeks Pickle Co.* (1955), 270 Wis. 179, 192, 70 N. W. (2d) 577, as follows:

"In order to recover interest there must be a fixed and determinate amount which could have been tendered and interest thereby stopped; the amount of the claim must be known and determined, or readily determinable."

Counsel's contention that Smith's damages were fully determinable on December 1, 1952, is inconsistent with the claim advanced with respect to the pelting of the 463 breeders at the end of 1953, and indicates a lack of faith on the merits of the latter claim. However, we have reached our conclusion with respect to the issue of interest solely on the basis of our prior determination that only 1952 losses were at any time recoverable.

There are at least two readily apparent reasons why Smith's claim for damages, as advanced at the trial and considered by the jury, was not readily determinable as of December 1, 1952. One is that at the trial, and in his brief, Smith claimed his death loss in 1952 was 1,150 while the demand made on November 28, 1952, was for a death loss

---

[3] For authorities approving the right of an appellate court to grant such an option as a condition to affirming the judgment, see 3 Am. Jur., Appeal and Error, p. 682, sec. 1173. Cf., *Sawdey v. Schwenk* (1958), 2 Wis. (2d) 532, 87 N. W. (2d) 500.

of 800. Furthermore, the surviving mink were not pelted until sometime in December and the pelts were not sold until some period of time after that. Thus the value of such mink as pelters was not determinable as of December 1, 1952, on the basis of the evidence before us on this appeal.

We, therefore, hold that the trial court properly denied interest upon the verdict.

*By the Court.*—If the plaintiff will file in this court within twenty days from the date of this opinion his election in writing to remit $16,140 of the amount of the judgment, the judgment will be modified by reducing the amount thereof to $11,580, together with costs and disbursements, and, as so modified, will be affirmed; otherwise the judgment will be reversed, and the cause remanded for a new trial on the issue of damages only. The defendants shall be entitled to tax costs on this appeal, except that the cost recoverable for printing defendants' brief shall be limited to 50 pages.