VALIGA and another [Case No. 271.]
BOECKER [Case No. 272.]
BRECKE, EDWARD, JR. [Case No. 273.]
BRECKE, EDWARD, SR. [Case No. 274.]
SMITH [Case No. 275.] Plaintiffs and Respondents and Cross Appellants, v. NATIONAL FOOD COMPANY, Defendant and Appellant: LEWIS and others, Third-Party Defendants and Appellants.

*Nos. 271–275. Argued February 27, 1973.—Decided April 20, 1973.*
(Also reported in 206 N. W. 2d 377.)

234

236

238

For the appellant National Food Company and the appellants Lawrence Lewis, Mary Lewis, Findley J. Lewis and Lawrence Lewis, Jr., d/b/a Lewis Fur Farms, there was a consolidated brief by *Fulton, Menn & Nehs, Ltd.,* of Appleton, on behalf of National Food Company; and *Gwin & Fetzner* of Hudson, on behalf of Lawrence Lewis, Mary Lewis, Findley J. Lewis and Lawrence Lewis, Jr., d/b/a Lewis Fur Farms; and oral argument by *Glenn L. Sharratt* of Appleton.

For the respondents to the principal appeal and as cross appellants on their motion to modify judgment (notice to review) there was a brief by *Tinkham, Smith, Bliss & Patterson* of Wausau and oral argument by *Richard P. Tinkham.*

For the defendant National Food Company on the issue of contribution as between it and Lewis Fur Farms, and as respondent to plaintiffs' cross appeal (to modify the judgment), there was a brief by *Fulton, Menn & Nehs, Ltd.,* of Appleton.

For the defendants Lawrence Lewis, Mary Lewis, Findley J. Lewis and Lawrence Lewis, Jr., d/b/a Lewis Fur Farms, as respondents to plaintiffs' cross appeal to modify the judgment and on the issue of contribution as between them and National Food Company, there were

briefs by *Gwin & Fetzner*, attorneys, and *Helen H. Madsen* and *John W. Fetzner* of counsel, all of Hudson.

CONNOR T. HANSEN, J.   We consider the several issues presented on this appeal to be:

1.  Did the trial court err in answering the first question of the special verdict "Yes," thereby ruling as a matter of law that the coho was unfit as mink breeder food?

2.  Was sufficient evidence presented at trial to sustain the jury's award for male and female breeder loss?

3.  Did the trial court err in failing to give the "absent witness" instruction?

4.  Have appellants waived alleged trial court error by failing to move for a mistrial?

5.  Did the trial court err in admitting into evidence plaintiffs' computations as to alleged damages and in submitting them to the jury?

6.  Did the trial court err in refusing to admit witness Eidem's opinion as to plaintiffs' losses?

7.  Was the issue of insurance improperly and prejudicially interjected into the case at the *voir dire?*

8.  Were appellants prejudiced by the statements, which referred to insurance, made during the testimony of one of the plaintiffs?

9.  Are plaintiffs entitled to prejudgment interest?

10.  Did the trial court err in refusing to submit the issue of implied warranty, running from Lewis to National, to the jury?

11.  Is there credible evidence to support the jury's verdict as to the negligence of Lewis?

The issues between the plaintiffs and National and Lewis were argued and briefed jointly by National and Lewis and will be referred to as the contentions of the appellants.

*Coho unfit as a matter of law.*

At the conclusion of the testimony and prior to submission of the case to the jury, the trial court at the request of plaintiffs, and over objection, answered the first question on the special verdict, "Yes." [1] The trial court determined as a matter of law that the coho salmon sold by National to the plaintiffs was unfit for use as mink breeder feed. On review, this court must examine the evidence most favorable to the party against whom the motion is directed and if there is any evidence which will sustain his contentions, the motion should have been denied. [2] An issue should be taken from the jury and a verdict directed against a party only when the evidence gives rise to no dispute or is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion. *Zillmer v. Miglautsch* (1967), 35 Wis. 2d 691, 151 N. W. 2d 741; *Jacobson v. Greyhound Corp.* (1965), 29 Wis. 2d 55, 138 N. W. 2d 133.

In the instant case, upon our review of the evidence adduced and rationally considered as to the fitness of the coho sold by National to the plaintiffs, it cannot be said that a dispute exists as to the fitness of the coho as food for breeder mink. All of the experts, both veterinarians and scientific researchers, testified that in their opinion the coho was unfit for use as a food for breeder mink.

[1] While such procedure is permissible under the proper facts, this court has stated that it is the preferred procedure to reserve the disposition of a motion to direct a verdict until after the jury returns, in that a retrial is avoided if there is a reversal. *Low v. Siewert* (1972), 54 Wis. 2d 251, 252, 195 N. W. 2d 451.

See also: *Peter M. Chalik & Associates v. Hermes* (1972), 56 Wis. 2d 151, 201 N. W. 2d 514.

[2] *Peter M. Chalik & Associates v. Hermes, supra; Phoenix Ins. Co. v. Wisconsin Southern Gas Co.* (1970), 45 Wis. 2d 471, 173 N. W. 2d 610; *Quality Lumber & Coal Co. v. Kemp* (1970), 46 Wis. 2d 621, 176 N. W. 2d 401.

Whether appellants knew or should have known that the coho was unfit at the time of sale, and what particular contaminant carried by the coho caused plaintiffs' losses, is immaterial as to the trial court's determination. The question answered by the trial court in the affirmative was whether the coho was unfit for breeder mink food, not whether the appellants knew or should have known it was unfit. While a dispute may exist as to the particular contaminant contained within the coho that was responsible for plaintiffs' losses, no dispute exists as to the fact that the fish contained some harmful contaminant. The trial court did not err in ruling as a matter of law on this issue.

## Male and female breeder loss.

Upon the conclusion of testimony, National moved to dismiss any cause of action of the plaintiffs with respect to breeder loss. The trial court denied the motion and in its opinion following motions after verdict stated that it found competent and credible evidence from which the jury could make the determination as to the damages awarded.

In the event there is failure of proof on the part of the plaintiffs, the verdict for the plaintiffs should not be accepted by the court, *Ernst v. Greenwald* (1967), 35 Wis. 2d 763, 151 N. W. 2d 706; and where no credible evidence exists in support of the verdict, the verdict will be overturned, *Yelk v. Seefeldt* (1967), 35 Wis. 2d 271, 151 N. W. 2d 4. However, in determining whether credible evidence exists, the evidence must be viewed from a standpoint most favorable to the plaintiffs, *Smith v. Atco Co.* (1959), 6 Wis. 2d 371, 94 N. W. 2d 697, and it is only necessary to consider the testimony which sustains the verdict. *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 62 N. W. 2d 549, 63 N. W. 2d 740.

Appellants do not claim that the value of plaintiffs' breeder mink was speculative,[3] but that there is no credible evidence demonstrating that the breeders had been genetically harmed.

We are of the opinion that there was sufficient credible evidence to raise a jury issue and also to support its determination thereon. Both Drs. Hildebrandt and Hartsough, called by the plaintiffs, testified that in their opinion to a "reasonable veterinary certainty" the adult breeders fed the coho and the kits born after the introduction of the coho should not be retained as breeder mink for the following year. The opinions of these doctors were introduced into evidence without objection from the appellants as to the witnesses' competency to give such an opinion. Both doctors were well-qualified and experienced. Dr. Hildebrandt was a practicing veterinarian since 1958, specializing in mink and dairy cattle fertility. Dr. Hartsough had long been practicing in the veterinary profession in the mink industry and over a span of some twenty to twenty-five years had written numerous articles in this field.

Dr. Hildebrandt conducted his own feeding trials and testified that mink fed coho do not reproduce as well the following year and that levels of DDT and its metabolites remain in the body of the mink up to ten years after they had been exposed to it.

Plaintiffs, as experienced mink ranchers, and Ned E. Hood, an expert in breeder selection and value, testified as to the same opinion.

Such evidence supports the plaintiffs' contentions that the genetic quality of their respective breeders had been damaged.

Appellants introduced evidence and experts who testified to the contrary. They further argue that their ex-

[3] *See: Nelson v. Boulay Brothers Co.* (1965), 27 Wis. 2d 637, 135 N. W. 2d 254.

perts are more qualified in the field of genetics. While such testimony places the issue in dispute, it does not command reversal. The weight of testimony and credibility of witnesses are matters for the trier of fact and are not to be disturbed if more than one reasonable inference can be drawn from credible evidence.[4] It is not the function of the supreme court to review questions of credibility of witnesses.[5]

There is competent and credible evidence from which the jury could determine the plaintiffs' breeder minks were irrevocably damaged as to their genetic value. Furthermore, we believe the appellants are attempting to apply an improper test as to the reasonableness of the damages awarded.

Upon discovering the effects of the coho upon their mink herds, the plaintiffs determined that the breeder mink could no longer produce acceptable kits and "pelted" them out. The breeders were killed and sold for their pelt values, which was substantially less than their value as breeders. At trial, plaintiffs sought damages to compensate for this loss.

Appellants argue that the breeders' ability to propagate was not permanently damaged; that the plaintiffs erroneously "pelted" out their breeders; and that the appellants should not be liable therefor.

The test should not be whether the actions of the plaintiffs, in attempting to mitigate their damages, were right or wrong, but rather whether they were reasonable.[6]

[4] *Babler v. Roelli* (1968), 39 Wis. 2d 566, 159 N. W. 2d 694; *Erdmann v. Frazin* (1968), 39 Wis. 2d 1, 158 N. W. 2d 281.

[5] *Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 155 N. W. 2d 619.

[6] *See:* sec. 402.715, Stats., which provides:

"Buyer's incidental and consequential damages. (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially rea-

The question of reasonableness is one for the jury. There is sufficient evidence to establish the conduct of the plaintiffs as reasonable.

*Absent witness instruction.*

Plaintiff, Gilbert Smith, testified that soon after he discovered his whelping problems, he sent three of his female breeders that had lost young to Ralston-Purina in St. Louis, Missouri, for testing. Two more were sent in August. He further testified that they had been killed for examination but that he had received no written report as to their findings as of the date of trial. No reports of Ralston-Purina were admitted into evidence and no witnesses therefrom were called.

Appellants requested the trial court to instruct the jury as provided by Wis J I—Civil, Part I, 410, that when a party fails to call a material witness within his control, or whom it would be more natural for that party to call than the opposing party, and the party fails to give a satisfactory explanation for his failure to call the witness, then the failure to produce such a witness gives rise to an inference that the testimony would be unfavorable.

Appellants contend that an inference must arise that the evidence available from Ralston-Purina was unfavorable to the plaintiffs and that the jury should have been instructed thereon.

sonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include:

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover or otherwise;* and

"(b) Injury to person or property proximately resulting from any breach of warranty." (Emphasis added.)

246

The "absent witness" rule was stated in *Coney v. Milwaukee & Suburban Transport Corp.* (1959), 8 Wis. 2d 520, 526, 99 N. W. 2d 713, as:

"In 20 Am. Jur., Evidence, p. 188, sec. 183, it is stated: " 'It is a well-established rule that where relevant evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and he fails to do so, *without satisfactory explanation,* the jury may draw an inference that such evidence would be unfavorable to him. This rule is uniformly applied by the courts and is an integral part of our jurisprudence.' (Emphasis supplied.)"

Not every failure to produce evidence indicates or gives rise to the inference that the absent evidence would be unfavorable to that party's cause. There must be a reasonable relationship between the failure to produce the evidence and the inference to make the inference permissible and grounded in fact. *Shaw v. Wuttke* (1965), 28 Wis. 2d 448, 459, 137 N. W. 2d 649. This court has stated in *Ballard v. Lumbermens Mut. Casualty Co.* (1967), 33 Wis. 2d 601, 615, 616, 148 N. W. 2d 65, that:

". . . A party to a lawsuit does not have the burden, at his peril, of calling every possible witness to a fact, lest his failure to do so will result in an inference against him. The requirements of the absent material witness instruction should be narrowly construed to be applicable only to those cases where the failure to call a witness leads to a reasonable conclusion that the party is unwilling to allow the jury to have the full truth. . . ."

In the instant case, samples of the coho salmon were sent to WARF and the United States Bureau of Commercial Fisheries for chemical analysis. Adult and kit mink were examined by Drs. Hildebrandt and Hartsough. Mink tissues and organs were examined by WARF and the United States Bureau of Commercial Fisheries. All of these analyses and examinations were presented in evidence by the plaintiffs. They were substantially identi-

cal as to pesticide and chemical content. The reports of Dr. Aulerich taken at East Lansing, Michigan, were introduced into evidence by defendants.

Plaintiffs did not obtain a written report from Ralston-Purina prior to trial. The record further demonstrates that plaintiff, Gilbert Smith, signed an authorization permitting National to examine his records at Ralston-Purina and sent it to Ralston-Purina two weeks prior to trial. It cannot be said that plaintiffs were attempting to conceal the truth.

The trial court did not err in refusing to give the "absent witness" instruction to the jury. The potential witness was equally available to all parties.[7] The trial court properly denied appellants' request.

### Conduct of trial—waiver.

Appellants further allege and direct this court's attention to several instances of what they claim as prejudicial error on the part of the trial judge. The record reflects that counsel for the appellants entered timely objection to all and presented some, but not all, of the issues in motions after verdict. However, in most instances, appellants' counsel failed during the course of trial to make a motion for mistrial. This court has stated that only judicial error which is serious enough to call for a trial court motion for mistrial will be considered on appeal.[8] This court has recently stated in *Leibl v. St. Mary's Hospital of Milwaukee* (1973), 57 Wis. 2d 227, 231, 203 N. W. 2d 715, that:

". . . While timely objection is necessary to preserve the error, and motions after verdict are generally con-

[7] *Schmiedeck v. Gerard* (1969), 42 Wis. 2d 135, 143, 144, 166 N. W. 2d 136; *Booth v. Frankenstein* (1932), 209 Wis. 362, 245 N. W. 191.

[8] *Carlson v. Drews of Hales Corners, Inc.* (1970), 48 Wis. 2d 408, 419, 180 N. W. 2d 546.

sidered to be a prerequisite to appeal, such procedure does not necessarily constitute a basis for reversal. As a matter of procedure, counsel cannot simply interpose an objection, then remain silent and be heard to complain only after an adverse verdict has been returned.

"In *Kink v. Combs* (1965), 28 Wis. 2d 65, 72, 135 N. W. 2d 789, this court held:

" '. . . By failing to move for a mistrial at that time defendant waived his right to assert prejudice later. . . .

" 'In the instant case the defendant, if he felt aggrieved, should have moved for mistrial at the close of the plaintiffs' case. . . .

" 'Failure to make a timely motion can only be construed as an election to rely on the possibility of a favorable jury verdict. . . .' "

Appellants assign as error (1) the admittance of plaintiffs' written compilations of claimed losses into evidence and allowing them to go to the jury room, (2) the trial court's refusal to allow into evidence witness John Eidem's opinion as to what plaintiffs' records showed their losses to be, and (3) the asking of a question on *voir dire* inquiring whether any member of the panel or their family were engaged in the business of investigating claims. Although appellants objected in each instance and moved for a new trial on motions after verdict on the above issues, they failed to move for mistrial as to all of the above claims. It would appear that appellants preferred to continue with trial and take their chances with the outcome rather than move for mistrial. Appellants thereby waived the above assigned error and such waiver precludes them from raising the issues on appeal.[9]

[9] Prejudicial error claimed as to questions and answers of witness were waived where the record showed no objections thereto, no motion for mistrial, and no motion for new trial. *Milwaukee v. Milwaukee Amusement, Inc.* (1964), 22 Wis. 2d 240, 255, 125 N. W. 2d 625. Potential error in asking the jury about insurance waived if no motion for mistrial. *Beijer v. Beijer* (1960), 11 Wis. 2d 207, 105 N. W. 2d 348.

*See also: Neider v. Spoehr* (1969), 41 Wis. 2d 610, 622, 165 N. W. 2d 171.

However, none of the above claimed errors constitute prejudicial error to the cause of the appellants.

*Plaintiffs' computations as to losses.*

Over objection, the trial judge admitted into evidence tabulations and computations comprising summaries of the damages claimed by each plaintiff. The summaries were testified to in detail, explained and verified as accurate by each plaintiff, and corroborated by the testimony of Ned E. Hood, plaintiffs' expert on breeder selection and value and pelt values.

The trial extended for two full weeks and the jury was confronted with numerous witnesses. Each plaintiff raised minks of differing color and value. Each rancher's breeders differed in quality and value. The losses of each of the five ranchers varied in proportion to his different kit survival total, average pelt value, costs in raising the mink, system of selecting new breeders, and veterinary and other costs.

The record demonstrates that the jury relied heavily upon these exhibits in arriving at their determination as to damages. Appellants contend that in admitting into evidence these summaries of computation schedules, reflecting the damages as testified to by each of the plaintiffs, and allowing them to go to the jury room, appellants were unduly prejudiced and the figures contained therein overemphasized.

Whether such evidence should be admitted in the form of exhibits and later submitted to the jury rests in the sound discretion of the trial court. *Rickeman v. Williamsburg City Fire Ins. Co.* (1904), 120 Wis. 655, 661, 98 N. W. 960.[10]

---

[10] *See also: Schnepf v. Rosenthal* (1972), 53 Wis. 2d 268, 272, 193 N. W. 2d 32; *Shoemaker v. Marc's Big Boy* (1971), 51 Wis. 2d 611, 619, 187 N. W. 2d 815; McCormick, *Evidence* (2d ed. hornbook series), pp. 539, 540, sec. 217; 6 Wigmore, *Evidence* (3d ed.), pp. 608, 609, sec. 1913.

The trial court recognized the secondary quality of such computations. However, in light of the protracted length of trial and the voluminous and complicated testimony, the trial court, in the exercise of its judicial discretion, determined that such computations would serve to aid the court and jury, rather than overemphasize or unduly prejudice. The trial court was of the opinion that without written computations of damages it would have been impossible for the jury to keep track of all of the many items included as to each plaintiff seeking damages.

In *Fischer v. Fischer* (1966), 31 Wis. 2d 293, 304, 305, 142 N. W. 2d 857, this court recognized that:

". . . [T]rials occasionally are of protracted length and are replete with facts, figures, and computations that serve only to confuse a jury unless the figures are accurately before the jury at the time of deliberation. If, in the discretion of the court, it appears necessary to prevent jury confusion, we see nothing wrong with the practice of having counsel prepare tabulations and computations of matters in evidence. In the event facts and figures so submitted are not stipulated the trial judge should, by appropriate instruction, make that fact clear to the jury. The judge, by appropriate instructions, should also caution the jury not to place undue emphasis on the figures thus submitted as compared to figures that might otherwise be in evidence. . . ."

In this case the trial court failed to submit cautionary instructions to the jury. However, under the circumstances we find no prejudicial error commanding reversal. Appellants did not request the cautionary instruction. In addition, the verdict indicates that the damages as claimed by the plaintiffs were reduced in all cases by 30 percent and in some an additional 10 percent, to compensate for a prior sickness in the mink herd. Obviously the jury considered other evidence than plaintiffs' computations when it answered the damage question.

*Expert opinion—witness Eidem.*

Eidem was a certified public accountant called as a witness by National. He admitted he had no experience or knowledge as to mink breeder or kit values. After reviewing, in court, plaintiffs' income tax returns, part of their pelt sales and breeder records, and some but not all of the exhibits and testimony given at trial, Eidem admitted that there was insufficient data for him to make a financial analysis of the individual plaintiff's business operations. When Eidem attempted to state his opinion as to the average value of each plaintiff's breeders' and kit pelts in 1968, based on his analysis of their income tax returns and other miscellaneous records, the trial court sustained plaintiffs' objection thereto. The trial court held that Eidem was not qualified as an expert as to the value of mink and that no proper foundation had been established for Eidem's opinion testimony. The trial court was also of the opinion that since the facts and figures from which Eidem drew his opinion were already in evidence and ascertainable by the court and jury that Eidem would be making an argument to the jury which could more appropriately be made by defense counsel.

Whether opinion testimony of expert witnesses is properly received depends upon whether the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in consideration of the issues by the testimony offered. *Kreyer v. Farmers' Co-operative Lumber Co.* (1962), 18 Wis. 2d 67, 117 N. W. 2d 646. If the court or jury is able to draw its own conclusions without assistance of expert opinion, admission of such testimony is not only unnecessary but improper. *Cramer v. Theda Clark Memorial Hospital* (1969), 45 Wis. 2d 147, 172 N. W. 2d 427. Whether or not expert opinion should be admitted into evidence is largely a matter of the trial court's dis-

cretion. *Carstensen v. Faber* (1962), 17 Wis. 2d 242, 116 N. W. 2d 161; *Anderson v. Eggert* (1940), 234 Wis. 348, 291 N. W. 365.

A significant portion of the testimony of witness Eidem as to damages sustained by the plaintiffs was based upon his examination of their income tax returns. However, the plaintiffs' measure of damages is the fair market value of the mink and not the plaintiffs' net profit or loss for a given year.[11] It was not error for the trial court to refuse to admit the opinion testimony of witness Eidem.

### *Voir dire.*

Appellants contend that the trial judge improperly interjected into the case the issue of insurance during the *voir dire* and that such error was prejudicial to their cause.

After asking the prospective jurors several general questions the trial judge asked,

". . . [W]hether any member of the panel has any acquaintance or connection with any of the lawyers that have been introduced or their law firms— . . . — whether you or any member of your family who might be employed by any of those law firms or have any connection or business pending in these law offices?"

Following no affirmative response from any prospective juror, the trial court continued, and asked:

". . . [I]s there any member of the panel or any member of the panel who has a member of their family who is engaged in the business of investigating claims of any sort?"

In addition to no motion for mistrial, appellants failed to present this issue to the trial court in their motions

[11] *See: Brunette v. Slezewski* (1967), 34 Wis. 2d 313, 149 N. W. 2d 578; *Smith v. Atco Co.* (1959), 6 Wis. 2d 371, 94 N. W. 2d 697.

after verdict. Failure to point out with particularity the grounds for error in a motion after verdict constitutes a waiver of such errors. *Kobelinski v. Milwaukee & Suburban Transport Corp.* (1972), 56 Wis. 2d 504, 518, 202 N. W. 2d 415; *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 80 N. W. 2d 380. Appellants have waived any error that may or may not have existed.

*Testimony as to insurance.*

On direct examination, plaintiff Edward Brecke, Sr., testified in the following manner:

"*Q.* . . . Did they go out in the yard and look at some of the dead kits?

"*A.* No, I wanted to take them out there, but they wouldn't go out there. They said that . . . . but then there was another 'feller' come around after that, and I took him out, and walked around the ranch there.

"*Q.* . . . Where was he from or who was he with?

"*A.* I think probably he was an insurance man through National's, from Eau Claire or Chippewa; I didn't ask his name. And he got a sack of the coho to take along, fifty (50) pounds. And I said, 'Now is the time,' I said, 'to look over the ranch,' I said, 'we probably are going to have a little claim in, just so I ain't lying. The mink are here, and you can count them and look over what happened.' And there was a lot of little mink there!

"*Q.* . . . Did he count them or not?

"*A.* No, he didn't; he just walked there."

Appellants contend they were prejudiced by the interjection of insurance into the trial and that the trial court committed error in denying their motion for mistrial upon this issue.

The conduct of a trial is subject to the exercise of sound judicial discretion by the trial court and its determinations will not be disturbed unless rights of the parties have been prejudiced. *Dutcher v. Phoenix Ins. Co.* (1968), 37 Wis. 2d 591, 606, 155 N. W. 2d 609. Likewise, a motion for mistrial is addressed to the sound dis-

cretion of the trial court and the supreme court will not intrude in the absence of abuse of such discretion. *Andritsch v. Henschel* (1965), 27 Wis. 2d 461, 134 N. W. 2d 426. The witness' inadvertent and single reference to an insurance man who visited his ranch did not so prejudice appellants' cause as to require a mistrial.

## *Prejudgment interest.*

Plaintiffs, pursuant to sec. 274.12, Stats., request that this court review that portion of the judgment providing interest from May 21, 1971, the date of verdict. Plaintiffs assert that the series of events beginning in early spring of 1968, with the feeding of the coho to their mink, had culminated by January 1, 1969, and that all damages as to their breeder mink, kits and pelt value were "fixed" and "ascertainable" as of that date.

Plaintiffs request that the judgment be modified to provide interest upon the amount of the judgment as measured from January 1, 1969.

In respect to prejudgment interest, this court in *De Toro v. DI-LA-CH, Inc.* (1966), 31 Wis. 2d 29, 34, 142 N. W. 2d 192, adopted the rule that:

" 'The general rule is that in the absence of agreement to the contrary, liquidated damages bear interest, whereas unliquidated damages do not. 47 C.J.S., Interest, p. 28, sec. 19a; *Beck Investment Co. v. Ganser* (1951), 259 Wis. 69, 72, 47 N. W. (2d) 490. In order to recover interest there must be a fixed and determinate amount which could have been tendered and interest thereby stopped; the amount of the claim must be known and determined, or readily determinable. 47 C.J.S., Interest, p. 30, sec. 19b. Ordinarily, where the amount of a demand is sufficiently certain to justify the allowance of interest thereon, the existence of a setoff, counterclaim, or cross-claim which is unliquidated will not prevent the recovery of interest on the balance of the demand found due from the

time it became due, 47 C.J.S., Interest, p. 31, sec. 19b. See also Anno. 3 A. L. R. 809.' " [12]

This court, in *Congress Bar & Restaurant v. Transamerica Ins. Co.* (1969), 42 Wis. 2d 56, 71, 165 N. W. 2d 409, stated:

". . . As long as there is a genuine dispute about the amount that is due, the insurer should not have to pay interest until the amount has been determined and judgment entered thereon."

In the instant case, the record reflects a genuine dispute as to the amount of damages. Plaintiffs' combined complaints sought a total of $889,500. At the conclusion of the testimony, plaintiffs' counsel in his argument to the jury asked for damages in excess of $585,000. Ultimately, the jury awarded three of the plaintiffs 60 percent of the amount claimed at trial, and the other two 70 percent. Plaintiffs' original demand was more than twice the total amount awarded by the jury. In *Congress Bar & Restaurant, supra,* at page 71, this court stated:

"Respondent's claim was for an amount substantially in excess of the amount finally determined to be due. To award respondent interest when it was able to establish just over half of its claim would encourage the overstatement of claims."

The damages suffered by each plaintiff was not fixed or certain until finally assessed by the jury. Plaintiffs are not entitled to prejudgment interest.

*Implied warranty.*

National contends that the trial court erred in refusing to submit a question of implied warranty running from

[12] *See: Bigley v. Brandau* (1973), 57 Wis. 2d 198, 203 N. W. 2d 735.

Lewis to National in the special verdict. We agree with the decision of the trial court on this issue.

As between Lewis and National, the facts of this case do not present a usual seller and buyer situation. There is no question but what Lewis had been engaged in various aspects of animal feed business for many years. In fact, Lewis did some food processing itself and over an extended period of years had sold National a considerable amount of ocean fish for mink food. It is this experience that led Lewis to contact National when it learned that a considerable quantity of coho salmon was available because it had been declared unfit for human consumption, and that it possibly could be used for mink food. It is with this knowledge and background of experience that a small quantity of the coho salmon was made available to National for its own independent examination and testing to determine if it wanted to sell it as mink food.

National, which ultimately bought the coho salmon from Lewis and sold it as mink food, is one of the largest, if not the largest, seller of mink food in Wisconsin. It has been operating since 1885 and for twenty-five years prior to this action has sold mink food. It was the testimony of their vice-president and general manager that he believed National did more work in the field of conducting tests on mink feeds and mink diets than any other company. They advertise this fact in their advertising material and sales information to prospective customers, and have done so for many years. They engage in national advertising as to their ability to supply good mink feed to mink ranchers. National physically examined the coho sample and caused such nutritional and thiaminase tests to be conducted as they deemed appropriate. Based upon the results of these tests, National proceeded to sell the coho salmon to its customers for mink food.

Sec. 402.315, Stats., provides:

"Implied warranty; fitness for particular purpose. Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required *and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods,* there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose." (Emphasis added.)

Under the circumstances of the instant case no implied warranty existed by virtue of sec. 402.315. In order for there to be a jury question as to an implied warranty of fitness for a particular purpose, there must be some credible evidence in the record demonstrating reliance on the part of National.[13] No credible evidence exists that would tend to establish that National was relying upon Lewis' judgment as to the fitness of coho salmon as mink food. The testimony indicates that National was relying exclusively upon the examinations done by itself and others under its direction. Both Lewis and National were professionals in the field of animal food and National, in purchasing the coho from Lewis, was relying upon its own judgment as to its fitness for mink feed.

Furthermore, even if an implied warranty existed, we would agree with the trial court, that under the facts of this case, the question of implied warranty was excluded by sec. 402.316 (3) (b), Stats., which provides:

". . . When the buyer before entering into the contract *has examined the goods* or the sample or model *as fully as he desired* or has refused to examine the goods is no implied warranty *with regard to defects which an examination ought in the circumstances to have revealed to him; . . .*" (Emphasis added.)

National did not cause any tests to be conducted as to pesticide content in the coho salmon. The tests it had

[13] The official UCC comment 1 to sec. 402.315, Stats., states in part: ". . . The buyer, of course, must actually be relying on the seller."

WARF conduct were restricted to nutritional and thiaminase content. Starting in about 1965, some experts in the mink health field began raising questions with respect to damage to mink as a result of pesticide content in the Great Lakes' fish. Equipment for determining pesticide content had been available at WARF since 1965. The general manager of National knew there had been rumors with respect to the difficulties mink ranchers had after using Great Lakes' fish. He had read articles which dealt with the DDT content in these fish. He had read articles on mink raising written by Dr. Hartsough in which he said, "Be careful with it [Great Lakes' fish], there might be some problems." Nevertheless, with only the WARF tests for nutritional value and thiaminase content, National placed the coho salmon on the market knowing it was intended for use as mink food. In fact their salesmen were advised that the salmon was an "excellent food for mink."

Official UCC comment 8 (following Wis. Stats. Annot. sec. 402.316) states in part:

"8. Under paragraph (b) of subsection (3) warranties may be excluded or modified by the circumstances where the buyer examines the goods or a sample or model of them before entering into the contract. 'Examination' as used in this paragraph is not synonymous with inspection before acceptance or at any other time after the contract has been made. It goes rather to the nature of the responsibility assumed by the seller at the time of the making of the contract. . . .

". . .

"The particular buyer's skill and the normal method of examining goods in the circumstances determine what defects are excluded by the examination. A failure to notice defects which are obvious cannot excuse the buyer. However, an examination under circumstances which do not permit chemical or other testing of the goods would not exclude defects which could be ascertained only by such testing. Nor can latent defects be excluded by a simple examination. A professional buyer examining

a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe, while a nonprofessional buyer will be held to have assumed the risk only for such defects as a layman might be expected to observe."

Thus, the particular buyer's (National's) skill and knowledge are essential in determining what defects ought to be revealed to him and as to what defects are excluded by examination. National was a professional in the field of mink food and so advertised themselves. They were introducing a new mink food to market, new at least to their operation, and, had reason to believe that experts in the field had evidenced concern about problems associated with its use as mink food. Although the record is not clear whether they knew it, the laboratory that they employed to do nutritional and thiaminase tests, had been doing tests for pesticides for several years and had the equipment and personnel to do so. Tests that are customarily administered for animal food used before are insufficient as a matter of law when a professional is introducing a new mink food to the market and has reason to know there were problems to be considered in connection with its use.

## Lewis' negligence.

Third-party defendant, Lewis, argues that there was no credible evidence upon which the jury could find it negligent as to the plaintiffs and that third-party plaintiff, National, is not entitled to contribution.

Identical questions were submitted to the jury in the special verdict as to negligence of National and Lewis. The jury's affirmative finding in each instance established National and Lewis as joint tort-feasors. The jury apportioned the negligence between National and Lewis as 75 percent and 25 percent, respectively.

An examination of the evidence reveals that there is credible evidence upon which the jury could determine that Lewis was negligent as to the plaintiffs. Lewis was a professional in the animal food industry. At the time it purchased the coho salmon from the state of Michigan, the fish had been removed from the market for the purposes of human consumption. Other than attempting to test the fish for its thiaminase factor, Lewis conducted no tests of its own. While it knew that the state of Michigan was taking samples of the fish and had run tests thereon, it failed to inquire as to the results of those tests. Lewis knew or should have known that National intended to use the fish as mink food. From these facts and others, there was sufficient credible evidence produced at trial to raise a jury question as to the negligence of Lewis. National is entitled to contribution from Lewis in the amount of 25 percent of the judgment. *Bielski v. Schulze* (1962), 16 Wis. 2d 1, 114 N. W. 2d 105.

*By the Court.*—Judgments affirmed.