**GREISLER BROTHERS, INC., a Pennsylvania Corporation,
Plaintiff,**

v.

**PACKERLAND PACKING CO., INC., a Wisconsin Corporation,
Defendant.**

No. 69-C-307.

United States District Court,
E. D. Wisconsin.

Feb. 19, 1975.

W. Stuart Parsons, Quarles & Brady, Milwaukee, Wis., for plaintiff.

Bernard Berk, Green Bay, Wis., for defendant.

## OPINION

TEHAN, Senior District Judge.

This is an action for damages for breach of implied warranty of merchantability with respect to two shipments of beef from defendant Packerland Packing Co., Inc., a Wisconsin corporation, to plaintiff Greisler Brothers, Inc., a Pennsylvania corporation. Jurisdiction is grounded on diversity of citizenship.

The case is before the court following trial to the court and the submission of post trial briefs by the parties.

The following facts, agreed to by stipulation of the parties, furnish the essential background of the claims. The nature of the cause is for breach of contract. No tort claims are asserted. The contracts of sale in issue were made through a meat brokerage firm and included under the heading "Price", the term "CAF Philadelphia, Pa." The usages and customs of the meat packing trade are that under this destination contract, the seller bears the risk of loss until the beef has been received and accepted by the buyer. Packerland contends, however, that it is not responsible for any loss resulting from the carriage of the commodities after delivery to the common carriers. Greisler paid to the Kellogg Citizens National Bank the agreed price under each contract. Packerland was aware that Greisler was purchasing the beef for resale.

The agreed quantities and prices of the January shipment were a total of 35,173 pounds of beef at $13,191.38. Packerland loaded the beef into a "piggyback" trailer which it delivered to the Chicago and Northwestern Railway Company, the initiating carrier at Green Bay, Wisconsin. The trailer was designated CNW 500210 and was shipped by the railway on January 5, 1967.

Packerland prepared and forwarded to Greisler a waybill, invoice and order bill of lading with sight draft attached in connection with the January shipment. Under this type of shipment, the consignee is unable to break the seal or accept the shipment unless it pays the sight draft attached to the order bill or unless it is bonded to the railway for shipment.

The trailer arrived at the Philadelphia destination on January 10, 1967, at 6:45 a. m. and was grounded and ready for delivery at 10:30 a. m. at which time Greisler was advised of its availability. The trailer was picked up and delivered to Greisler's plant on January 12, 1967, at 6:00 a. m.

When inspected by the Railroad Perishable Inspection Agency (RPIA) at 4:50 p. m. on January 12, 1967, the beef in the trailer was partially spoiled, whereupon Greisler returned the trailer to the Reading Railroad siding from which it had been picked up. The RPIA again inspected the beef on January 16 and 17. With Greisler's authorization, the trailer was redelivered to Greisler's plant on January 17. Greisler recovered $2,200 from the Reading Company, the terminal carrier, in settlement of a claim it made against the railroad with respect to the January shipment.

The agreed quantities and price for the October shipment were 36,164 pounds of beef at $16,092.98. Packerland loaded the beef into a "piggyback" trailer and delivered the trailer, designated CNW 500313, to the Chicago and Northwestern Railway Company, the initiating carrier, at Green Bay, Wisconsin. The trailer was shipped on October 25, 1967.

Packerland prepared and forwarded to Greisler a waybill, invoice and order bill of lading with sight draft attached, in connection with the October shipment. The trailer arrived at the Philadelphia destination on October 29th, was grounded on October 30, 1967, at 10:30 a. m. and Greisler was notified of the availability of the shipment at 10:32 a. m. The trailer was delivered to Greisler on November 1, 1967, at 5:30 a. m. When inspected by the RPIA at Greisler's request at 2:15 p. m. on November 1, the beef in the trailer was partially spoiled. The RPIA made a second inspection of the beef on November 3, 1967.

Greisler recovered $4,339.68 from the Reading Company, the terminal carrier, in settlement of a claim it made against the railroad with respect to the October shipment.

On the trial there was evidence concerning the January shipment, that on inspection of the beef when the seal initially was broken on January 12, 1967, there was a strong odor which resulted in Greisler's request for the RPIA in-

spection. Following the inspection that afternoon, Greisler had the trailer resealed and returned to the railroad siding. Melvin Greisler, Greisler's president, then telephoned Packerland, notifying it that Greisler was rejecting the beef. He spoke to Charles McCarthy, an official at Packerland, who told him that Packerland would bear no responsibility. A telegram from McCarthy, sent on January 13, 1967, also advised Greisler that he could not reject the trailer for off condition of the beef. Following another telephone conversation between Greisler and Packerland, S. W. Frankenthal, president of Packerland, set forth the understanding reached by the parties concerning disposition of the shipment, by letter, dated January 16, 1967,[1] to the effect that Greisler would take in the meat, pay the draft and attempt to collect "any loss" it would sustain from the common carriers involved. The letter continued,

"If you are not successful in collecting this claim, we will turn the claim over to our insurance agency, Murphy Insurance Agency of Green Bay, Wisconsin; and it is understood that the first $1000 loss in this event shall be the loss of Greisler Brothers, Inc."

Melvin Greisler testified that the letter confirmed the understanding of the earlier telephone conversation, except that he did not agree that Greisler would bear any loss. He further testified that, on unloading of the January shipment trailer in the Greisler cooler, a government inspector in his presence, removed from some carcasses tags showing kill dates of December 28 and 29; that there were a lot of tags on the floor; that he saw the tags on the meat and himself removed other tags, not preserved for the trial that seemed to be from December 28, 29 and 30, 1966. Melvin Greisler was aware that the refrigeration unit of the trailer was defective from the RPIA report, and suspected that the "cause" was not the fault of

the railroad.[2] In view of the advanced degree of spoilage, he was of the opinion that the deterioration had started some days earlier.

As to the October shipment, the evidence shows that following delivery of the trailer on November 1, 1967, Greisler requested an RPIA inspection and thereafter sent two telegrams to McCarthy at Packerland, rejecting the shipment for off condition and offering to dispose of the contents on Packerland's behalf, if so instructed. Also, on November 1, a representative of Thermo King Sales, in Greisler's presence, checked the temperature inside the loaded trailer and noted that he could not hear the damper door open or shut.

McCarthy replied that day, by night letter, requesting retraction of the rejection and asking Greisler to send the necessary papers to enable Packerland to process the claim on Greisler's behalf. On November 2, Greisler again confirmed that he was rejecting the shipment and then informed Packerland that he had decided to go ahead and sell the meat at the best price without prejudice to "our respective rights."[3]

The trailer was unloaded on November 3, and the beef was again inspected by the RPIA at 8 a. m. that day. Melvin Greisler testified that he inspected the trailer after it had been unloaded and found and removed a 4 x 2″ piece of fat lodged in the damper door of the refrigeration unit. He thought that this prevented the door from closing and caused the malfunctioning of the unit. It was his opinion that the fat became lodged in the damper door due either to faulty loading or to faulty hanging of the carcasses in the trailer, necessarily attributable to Packerland since the trailer had been sealed after loading and until delivery to Greisler.

Greisler's claims as to the January and October shipments of beef against the Reading Company were filed and processed through its agent Sol Burak,

1. Exhibit No. 9.

2. Transcript p. 110.

3. Exhibit No. 27.

now deceased, of the S. J. Burak Traffic Bureau of Philadelphia and designated Nos. GB 117 and GB 670 respectively. For the purposes of Claim No. GB 117, Greisler obtained from Packerland the necessary records, including the kill dates of the beef, shown as January 3, 1967. The claim was filed on February 27, 1967, and lists the cause of the loss as "delay, condition, defective refrigeration, as per statement attached." [4] The claim was in the amount of $8,224.-59 as shown by the attached supporting statement of account sales.

Settlement discussion between Burak, with Greisler's approval, and a representative of the railroad led to a compromise in the amount of $2,200, which was paid to Greisler on May 14, 1968. The claim had been investigated by the railroad on February 28, 1967 and May 1, 1968. Its assumption of sole responsibility for the loss as determined as of the time Greisler broke the seal of the shipment was based on consideration of the malfunctioning of the refrigeration unit due to improper calibration, as well as all contributing factors. Nothing in the settlement figure was deducted for shipper responsibility or for that of any other party. The disallowance of a portion of the loss was based on excessive in-trailer storage by comparison of the RPIA dollar loss estimates of the condition of the beef on January 12 and January 17, 1967.

The October shipment claim, No. GB 670, was filed on March 22, 1968, and lists the loss as "due to delay, condition, defective refrigeration, carrier negligence, as per certified statement attached" [5] and was for the amounts of $7,122.17 and $1,609.30 (loss of profits), supported by an attached statement of amount of sales. The claim was allowed in the amount of $4,339.68 after settlement conference among Melvin Greisler, his attorney, and an attorney for the railroad. A representative of the railroad confirmed that a calibration test of the refrigeration unit on November 7, 1967, after return of the unloaded trailer to the railroad, showed that the inside temperature of the trailer was 7 degrees higher than that of the outside and that assumption of sole responsibility by the railroad rested on the malfunctioning of the unit. The railroad found no indication of shipper responsibility. The claim was paid on June 12, 1968.

Greisler has promised to indemnify the railroad against duplicate payments of any claims for the same losses or damages, which are supported with the original bills of lading and paid freight bills with respect to Claims GB 117 and GB 670.

Although Greisler contends that it looked to Packerland for recovery of the portion of the losses disallowed by the railroad, no documentary proof thereof was submitted. The filing of the instant action, which Packerland contends was its first notice of these claims, was on June 19, 1969.

Greisler contends that Packerland's liability for breach of warranty is established under the agreements of the parties and the controlling provisions of the Uniform Commercial Code in that the contract of sale was a destination contract under which the seller bears the risk of loss in transit.[6] Greisler exercised its right to inspect.[7] On inspection it appeared that the goods were spoiled and thus nonconforming. Therefore, Greisler had a right to reject [8] which it exercised within a reasonable

4. Exhibit No. 36.

5. Exhibit No. 37.

6. The Uniform Commercial Code defines the term "CIF" as cost, insurance and freight under which the risk of loss passes to the buyer on delivery to the carrier. Under the Code, the term "CAF" used in the instant contracts, which Packerland defines as "cost and freight", is synonymous with that of "CIF". §§ 402.319 and 402.320, Wis.Stats. Packerland did not carry insurance payable to Greisler, but was itself insured against loss for beef shipped by it during the time of transport.

7. § 402.513(1), Wis.Stats.

8. § 402.601, Wis.Stats.

time and by reasonable notification to the seller.[9] Then Greisler had the option to store, reship or resell the meat,[10] but no affirmative duty to take action because the meat was Packerland's which still bore the risk of loss.[11]

Alternatively, Greisler submits that it has shown shipper fault by evidence disclosing that the beef of the January shipment was too old as a cause of its deterioration and that the fat lodged in the damper door caused the malfunctioning of the refrigeration unit of the October shipment.

It is maintained that Packerland is also chargeable with the progressively accelerating deterioration of the beef during the period between initial inspection and final unloading because of its wrongful refusal to accept responsibility for the losses. If Packerland had instructed to sell the goods for Packerland's account, as Greisler requested, the bulk of the losses would have been recovered from the railroad. Greisler's settlements with the railroads are no bar to the instant action since Greisler stated that it did not give up its rights by filing the claims. Since Packerland bore the risk of loss until final acceptance of the shipments by Greisler, it is responsible for the amounts disallowed by the railroad for excessive in-trailer storage.

Packerland contends that under the agreements reached by the parties after Greisler inspected the goods and found them nonconforming, its liability was discharged when Greisler filed the claims with the railroad and accepted the settlements there reached. In the case of the January shipment, the understanding was express as set forth in the Frankenthal letter of January 16, 1967; as to the October shipment the agreement is to be implied. The phrase, "if you are not successful in collecting this claim, we will turn the claim over to our insurance agency," [12] meant total disallowance of the claim by the railroad, rather than partial disallowance of the amount claimed by Greisler, with Packerland responsible for the portion that was disallowed. In filing the claims with the railroad, a third party tort feasor, Greisler must be deemed to have acted in a fiduciary capacity for Packerland under § 402.722 [13] Wis. Stats. That duty was breached by Greisler when it settled and compromised its claims without consulting with or obtaining the consent of Packerland.

Packerland also submits that Greisler has not met its requisite burden of proof as to the breach of warranty, by failing to show the condition of the meat on arrival at the destination rather than on first inspection, and as to attribution of the respective portions of fault of the shipper, if any, and of the carrier which assumed sole responsibility of the spoilage of the beef on first inspection.

Plaintiff's cause of action for breach of implied warranty of merchantability arises under § 402.314, Wis.Stats. The

9. § 402.602, Wis.Stats.

10. § 402.604, Wis.Stats.

11. §§ 402.510(1) and 402.602(2), Wis.Stats.

12. Exhibit No. 9.

13. "402.722 *Who Can Sue Third Parties For Injury To Goods*
Where a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract:
(1) A right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other;
(2) If at the time of the injury the party plaintiff did not bear the risk of loss as against the other party to the contract for sale and there is no arrangement between them for disposition of the recovery, his suit or settlement is, subject to his own interest, as a fiduciary for the other party to the contract;
(3) Either party may with the consent of the other sue for the benefit of whom it may concern."

official Uniform Commercial Code Comment on this section contains the following note:

"13. In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense. Equally, evidence indicating that the seller exercised care in the manufacture, processing or selection of the goods is relevant to the issue of whether the warranty was in fact broken. Action by the buyer following examination of the goods which ought to have indicated the defect complained of can be shown as matter bearing on whether the breach itself was the cause of the injury." Official UCC Comment to # 2–314.[14]

The reference to a showing of proximate cause reflects the tort aspects of a cause under implied warranty, which may require proof of fault.[15] This is particularly true where the facts show that the conduct of a third party, such as a carrier, was responsible for the nonconforming nature of the goods, that allegedly constitutes the breach of the warranty. In this situation, it is not of first concern who, as between buyer and seller, has title to the goods in transit or is deemed to bear the risk of loss, since the Code provides for a cause of action against the third party by either party

to the contract of sale under § 402.722, Wis.Stats.[16]

Plaintiff in this case availed itself of its rights as buyer, in filing its claims with the railroad under the Carmack amendment of the Interstate Commerce Act, Title 49 U.S.C. 20(11). After investigation of the claims, the carrier assumed sole responsibility for causing the loss and deducted nothing for shipper fault. It does not appear that Greisler, which, in the instant action, alleges shipper fault known to it before filing of either of the claims with the Reading Company, apprised the railroad of these facts.

Plaintiff maintains that defendant must nevertheless be held responsible for the amounts disallowed by the railroads because it bore the risk of loss until final acceptance of the shipments by Greisler on January 17 and November 2, respectively, and because of the understanding of the parties, whereunder Greisler allegedly preserved its rights.

No matter what construction may be placed on the phrase "if you are not successful in collecting this claim", it is not reasonable to assume that Packerland thereby agreed that plaintiff should submit the claims to the carrier on the basis of sole railroad responsibility; settle and compromise these claims in substantially reduced amounts without Packerland's participation, knowledge or consent; and then, more than a year after acceptance of payments from the carrier, assert the claims in modestly augmented amounts[17] based on breach of warranty and alternatively on shipper fault in the instant action.

---

14. Wisconsin Statutes Annotated § 402.314, at 194, 195.

15. See Annotation, Contributory Negligence or Assumption of Risk as Defense to Action for Personal Injury, Death, or Property Damage Resulting from Alleged Breach of Implied Warranty, 4 A.L.R.3rd 501 (1965); Natale v. Pepsi Cola Company, 7 A.D.2d 282, 182 N.Y.S.2d 404, 407 (1959) ("If the essential cause of the occurrence was something other than the breach of the implied warranty, no matter what, the defendant is

not liable.") Valiga v. National Food Co., 58 Wis.2d 232, 206 N.W.2d 377 (1973), (comparison of fault with that of party charged with negligence.)

16. See fn. 13.

17. The claims filed with the railroad, as shown by Exhibits 36 and 37, were in the amounts of $8,224.59 and $8,731.47, respectively. The losses claimed in the instant action as shown by plaintiff's statement of damages, Exhibit 14, are in the amounts of $9,507.29 and $9,125.15.

Ordinarily, the fiduciary duty of a party plaintiff under § 402.722 may be met by giving credit for the amounts recovered from the third party, Ninth Street East, Ltd. v. Harrison, 5 Conn. Cir. 597, 259 A.2d 772 (1968), where plaintiff seller made unsuccessful efforts to secure the buyer's cooperation in asserting its claims against a carrier. This assumes a course of fair dealing not only with the seller in the case, but also with the third party tort feasor charged with responsibility, to satisfy the requirement of good faith in the performance or enforcement of every contract within the Uniform Commercial Code.[18] Since Greisler intended to recover the remainder from Packerland, it cannot be maintained that Packerland benefitted from the settlement with and recovery from the railroad.

While the record does not permit a finding who, personally, is chargeable with the failure to observe the required good faith or the fiduciary obligations to Packerland, since plaintiff acted through a claims agent, now deceased, and through counsel, the breach nevertheless is chargeable to Greisler.

It is the determination of the court, that under the circumstances of the filing and disposition of the claims against the railroad shown by the record, Greisler is barred from asserting any causes based on breach of warranty or on alleged fault of the shipper, to recover from Packerland that portion of the claims disallowed with Greisler's consent, by the settling railroad.

It is noted that Packerland did not plead the defense of a bar due to breach of fiduciary duty in the settlement with the railroad with particularity. However, the proof on the trial went beyond the pleadings of either party and these pleadings are hereby deemed amended to conform to the proof.

There are additional grounds why plaintiff cannot prevail in the instant action. One of these is the failure of proof as to the shipper fault with respect to breach of warranty and in tort. To show that the January shipment of beef was too old, plaintiff testified that the inspector and Melvin Greisler both removed tags from the carcasses showing kill dates of December 28 and 29, three of which were preserved and offered as exhibits on the trial,[19] and that many more tags were on the beef and on the floor of the cooler. The exhibit in question consists of one orange and two green tags. The weights reflected on these tags do not correspond to any of the hot weights obtained at the time of billing, or to any of the cold weights determined on loading of the beef.[20] While the green tags may reflect minor discrepancies between hot and cold weights of some of the carcasses as to which the cold weights are not available, it appears that the weight of 124 pounds shown on the orange tag of carcass No. 62, has no relation to those of the tally sheet of 736 and 740 pounds. Greisler has not satisfactorily explained these discrepancies. It is noted that plaintiff admitted that it was unusual that any tags were attached to carcasses of beef. On the other hand, Packerland testified to the usual practices of shipping freshly killed rather than stale beef and offered a reasonable explanation of the presence of the kill tags on the floor of the trailer remaining from previous shipments. In view of the total evidence on the question of the kill dates of the January shipment of beef and particularly plaintiff's failure to call the claimed staleness to the attention of

---

18. § 401.203 Wis.Stats. provides as follows:
"OBLIGATION OF GOOD FAITH
Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement."
§ 401.201(19) defines "good faith" as meaning "honesty in fact in the conduct or transaction concerned."

See also, R. Eisenberg, Good Faith Under the Uniform Commercial Code—A New Look at an Old Problem, 54 Mar.L.Rev. (1971).

19. Exhibit No. 13.

20. Exhibit 43.

Packerland in its correspondence before agreeing to processing the claim with the railroad and its failure to advise the railroad of this alleged cause of the loss, the court determines that plaintiff has failed to establish the alleged fault by a preponderance of credible evidence as to the January shipment.

Attribution of shipper fault with respect to the October shipment is speculative. If the piece of fat could have lodged in the damper door in the loading process, it could, similarly have lodged there during the unloading. Notwithstanding the fact that on inspection of the loaded trailer it was noted that the opening and closing of the damper door could not be heard, it was subsequently determined that the unit was substantially miscalibrated. This determination was made on inspection of the empty trailer on its return to the railroad and furnished the basis of acceptance of responsibility by the railroad. Again, it is noted that plaintiff failed to apprise the carrier of this alleged fault of the shipper, and apparently similarly failed to so inform Packerland before processing the claim with the railroad.

■ A further deficiency of the proof lies in plaintiff's failure to offer a basis for apportioning responsibility for the loss due to shipper fault, if any, as compared with the admitted fault of the carrier.[21] While it may appear as a ready answer to seek recovery against the shipper for the portion disallowed by the carrier, utilization of that formula does not furnish sufficient certainty to support an award of damages, since the carrier assumed sole responsibility for the spoiling of the beef and the disallowance of a portion of the claim did not take into account any joint or contributing fault of the shipper but was based on plaintiff's delay in acceptance of the shipments.

Plaintiff contends that the settlement with the railroad would not defeat its claim against Packerland, since defendant could look to the railroad for indemnification or contribution after satisfying plaintiff's claim. This, of course, would not serve to establish the comparative fault of the parties or furnish requisite certainty as to liability for damages. Further, it is noted that Greisler has agreed as part of its settlements with the carrier to indemnify the railroad against duplicate payment for any claim for damages for the same losses.[22]

The foregoing determinations of the court make unnecessary a resolution of plaintiff's contention that Packerland's liability for breach of warranty under the Code rests on the fact that the defendant bore the risk of loss until Greisler finally took in the respective shipments for processing. It is noted, however, that this contention raises a factual issue, towit: Whether or not the conduct of the parties and their express and implied agreements concerning filing of the claims with the railroad varied the controlling Code provisions with the result that plaintiff must be deemed to have accepted the shipments on initial breaking of the seal and payment for the goods. It is clear that the beef was thereafter under the control of the plaintiff.[23] Its assertion that it was filing the claims with the carrier without prejudice to its rights does not unequivocally establish rejection. Further, in view of the excessive in-trailer storage of the spoiled beef of the January shipment, it may be questioned whether plaintiff took all reasonable action to salvage the rejected goods or otherwise to minimize the damages.[24]

21. See for example, Valiga v. National Food Co., 58 Wis.2d 232, 206 N.W.2d 377 (1973), where unlike here, the other party charged with fault was joined as a third party defendant.

22. Exhibits 36 and 37.

23. For example, plaintiff did not refer the railroad inquiry of January 13, 1967, concerning disposition of the goods to Packerland. See Exhibit No. 35.

24. See § 402.603, Wis.Stats. "Merchant and buyer's duties as to rightfully rejected goods," and O'Brien v. Isaacs, 17 Wis.2d 261, 116 N.W.2d 246 (1962).

The foregoing opinion stands as the court's findings of fact and conclusions of law in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure. The clerk is hereby directed to enter judgment against the plaintiff and for the defendant, dismissing the action, and for defendant's costs.